I want to take it a little bit out of order and address the sentencing issues first. And in this case, Mr. Inouye was sentenced to 12 months, 12 years of incarceration. And we're contending in this case that the sentence imposed by the district court was both procedurally erroneous and substantively unreasonable. The procedural error in this case was the imposition of an obstruction of justice enhancement. And the court issued the obstruction enhancement based on two bases. The principal basis, which we contend was based on clear error, was that Mr. Inouye had the victim in this case, Mr. Horlocker, ride a kite, stating what happened in the prior assault at a time when Mr. Inouye and Mr. Horlocker found themselves together right before trial. In the San Bernardino County Jail. In this case, what happened was we tried this case in 2010. In the spring of 2009, they brought in the victim, Horlocker, to testify again to the grand jury. They put him in the San Bernardino County Jail, which is a holding facility. They also, by happenstance, brought Inouye in, and these two guys find themselves together in general population in the same institution. How can you say it's happenstance? Because Inouye has no control over where they put him. But the Bureau of Prisons did. And the Bureau of Prisons, their job is to make sure that something like this doesn't happen. Yes, we think it was probably error of the guards to put these guys in the same institution, but the point I'm trying to make... That's why we talked to the guards. The BOP who transferred Inouye to the San Bernardino County Jail. And what about the BOP who transferred the federal chair to the victim? As I understand it, the government rented in Horlocker to testify in front of the grand jury. I suppose the BOP would be responsible for where Mr. Horlocker was held as well. But for the BOP, that's the fault. Correct. Yes, so don't say happenstance. They screwed up. I thought it was pretty sharp, and it screwed up. No, Mr. Inouye did not ask to be placed in the presence of Mr. Horlocker. Mr. Inouye asked Mr. Horlocker to write a kite stating what had happened. The district court clearly erred in stating that Mr. Inouye threatened Mr. Horlocker. The finding of the district court that's clear error is on page 238 of our excerpts. We're seeing that Mr. Inouye pressured or had threats of violence. He simply was there in the same institution, and he asked Horlocker to write a letter stating what had happened four years previously. Where the district court got it wrong is that in some pretrial motion practice, the government attached some phone calls, transcripts of phone calls between Horlocker and the FBI, where Horlocker calls up his handler of the FBI and says, get me out of here. There's this guy Inouye in the same institution. We're both in general population, and anything could happen. You've got to get me out of here. That was Horlocker's subjective feeling about that he had some potential exposure, something might happen based on the events of four years earlier. But Inouye himself, other than simply asking Mr. Horlocker to write a letter of what had happened, did not. The district court was just wrong that Mr. Inouye threatened Horlocker in any way, other than if his mere presence in the same institution cannot be the threat, the simple request to write a letter cannot be a threat, even in the context of what had happened before. So. Well, how is that? I mean, I guess that's where, when you look at this issue, that's where we come down to. I mean, how is it unreasonable for the judge to say, especially in light of the context of what had happened here, that any sort of request was not intimidating or threatening? I mean, these are, from the record, pretty violent gang. It looks like there's certain rules, and if you violate the rules, there will be very dire consequences. And so I guess you're asking the court to say this was just a simple request, but in light of the context of the facts and everything, the history between these individuals and this gang, how is it unreasonable for the district court to say that Mr., the victim here, was not threatened? Because following the logic of that, any communication, any gesture, any communication at all between Mr. Inouye and Mr. Horlocker then would be a threat. No matter how polite, no matter how civil, no matter how non-threatening the words themselves are, it would be a threat sufficient to impose an obstruction of justice enhancement simply based on something that had happened four years before. I submit to the court you've got to have something a little bit more than that, some evidence of intimidation, some evidence of the words or gestures. Mr. Inouye, what we know, we know that Mr. Horlocker was being beaten and disfigured and sliced up because he was paraphrasing his boss, Mr. Inouye, and his cohort, and he would have been threatened with beating his dad the next time around. And then they were separated, and then it turns out they were two feet of each other in the same prison. That works to say, is that right? Yes, in fact, the testimony was that they were having chow at the same table. They were crossing each other. That's just wonderful. Here's your tormentor, and you think people get over something like that for four years? Well, I don't think they get over it for the rest of their lives. So there he is, and if that isn't a very, very, to him, and I think rightfully so, dangerous situation, but somehow he's put together there by the Bureau of Prisons, and he's trying for help from the FBI, from the FBI, and this guy comes up to him and tells him to write out a note. So you can use it to say that the court offers that conduct that starts between attacks with injuries and that if you let this guy out, there will be consequences. The only part I would disagree with is he didn't come up to Horlacher and tell him to write the kite. The evidence was, hey, Fred, how about writing a kite and stating what happened four years earlier? Hey, Fred, it's interesting because even one of the other disputed issues here was a co-conspirator statement and whether it was allowed. If you look at that, I think the question was whether the district court abused its discretion in admitting inmate Campbell's statements to Horlacher, and I guess they're all part of the same gang, is that correct? Part of the same group, supposedly. Group or whatever, that said that next time we'll kill you, and that's what you get for putting stuff on paper. I'm trying to figure out how it was not within the court's ability, the district court's ability, who's in a much better position than we are, to determine whether or not there should have been an adjustment here for obstruction. I'm just pulling out those from the issue that we've had to see, but I know that the record is replete with the history of this gang and their interactions or this group and their interactions, and so you don't deny that he asked him to do that, I guess. Asked him to write the kite? Right. No, yes, it was written at Inouye's request. Right, and so the question, I mean, the whole point that you want to make is that you say Mr. Horlacher shouldn't have been intimidated by it. No, I'm saying that Mr. Inouye does not deserve an extra two points where he does nothing to force or intimidate or threaten Mr. Horlacher to write the kite. Otherwise, any contact between Inouye and Horlacher in the San Bernardino County Jail, he picks up an automatic two points. That's what I think is unfair to Inouye. No matter how polite he is, no matter, you look at the tone of the kite where he says, hey, Hawaiian Chris, it's like they were buddy-buddy with one another, no matter how collegial and non-threatening the request. It's like they can be buddy-buddy one minute and then their, I don't know what the term was, cutting them up like a fish the next minute. I mean, from the way this group interacts, so. Well, my point simply is, Your Honor, there was no objective, there were no objective indicia of threats or intimidation as found by the district court, simply beyond the contact itself. And my position is that it shouldn't, he shouldn't pick up an extra two points, no matter how polite he was in soliciting this, soliciting this kite. And that was the principal problem with the district court and the procedural error. I see I'm running out of time, so I'll reserve my remaining time for rebuttal. Thank you. You're Mr. Rafael? I am. Okay. May it please the Court. Good morning, Your Honor. Stoney Rafael on behalf of the United States. Judge Phillips did not clearly err in adjusting the defendant's offense level by two levels based on obstruction of justice. It's important to keep in mind that Judge Phillips found two bases, two independent bases for imposing the enhancement. The first basis is what happened pre-trial at the San Bernardino Detention Center. And I want to stop real quick to address one question that Judge Pregerson raised initially with regard to who was, who dropped the ball. And in this case, Your Honors, there was no dropping of the ball. It wasn't BOP that dropped the ball. The defendant had been raided out because he was indicted. The witness was raided out to go to Grand Jury. They were in transit. They were not in the BOP's custody anymore. They were at a local facility that was contracted by the Marshals. It shouldn't have happened. It did happen, unfortunately. But what we know from the PSR, the PSR at paragraph 13, which was not objected to by the defense, and I quote, At one point, the defendant asked the victim if the victim would help the defendant in his criminal case, this criminal case. The defendant asked the victim to say that the victim had threatened the defendant back in 2005. Fearing for his safety, the victim agreed to do that. And he wrote three kites to the defendant. The defendant kept one of those kites. And the kites that the defendant kept, this is in the excerpt of record at page 34, the kite starts with, Hello, Chris. I will let who I need to do that, that it was me that threatened you the night before on the tier. I said that I was going to stab and whatever I could. I will do what I have to to expletive these people so you can't get a case. In fact, before the district court, at the sentencing hearing, defense counsel conceded that there may have been an implied threat based on past history. In fact, there was, of course. As the video shows, and if your honors have not seen the surveillance video, I would urge your honors to watch the video. In this case, it's very telling. As the video shows that prior to the assault, this brutal assault on the victim, they hugged each other. They shook hands. And then the defendant proceeded to take him down, and with the assistance of a co-conspirator, to brutally assault the victim. There was another basis for the enhancement, for the obstruction of justice.  Defendant's testimony, as the district court judge Phillips found, he testified that he was acting in self-defense. The court found based on his statements, statements that witnesses, VOP witnesses heard during the assault and right after the assault, that was not supported. Defendant testified that he was just trying to protect the victim. He was frisking him. The district court did not find that credible. Even the defense's case, your honors, their own witness, the first witness they called, Odom, another inmate who was in the cell, who was in the red cage, but did not participate, also contradicted the defendant. Odom said he was in the cell the night before with Horlocker, with the victim, and never heard or saw the victim make a threatening gesture, a stabbing gesture, as the defendant testified. Defendant testified that in the red cage, minutes before the assault, or seconds before the assault, the victim said, I'm going to put holes in Chris, referring to the defendant. Their own witness said, I didn't hear that. There were many bases for the obstruction of justice. Well, for the perjury, if we focus on that, that requires a high degree of proof,  a high degree of proof for the perjury as a basis for the obstruction. This issue was briefed before Judge Phillips, and the Donegan case was cited, as the court knows, and it requires a willful, material, false statement that could have affected the outcome. And here, Judge Phillips implicitly found that the defendant was not mistaken. You know, him claiming self-defense versus the statements that the BOP officials heard, next time we'll kill you, or something along those lines, the statements that he was muttering right after the assault, walking up and down. And when you watch the video, you can see the defendant pacing back and forth. And one of the officers testified that when the defendant was doing that, he was saying, don't ever, and I don't want to misquote the statement, that something has to do with the kite. So clearly, this was an assault, pre-planned assault, that the defendant and Thuron Hill, the other co-conspirator, planned. And he takes the stand and claims it wasn't self-defense, that he was trying to protect the victim. That he said, man down, to summon help. But in our rebuttal case, we presented evidence, one witness who said, defendant never said man down. So the defendant was not, and these are all very material statements. They go to the claim of self-defense, one of the elements that the government had to prove beyond a reasonable doubt. Your Honor, unless there are any other questions on this issue, I would like to address some of the other issues that are raised by the defense. And I'm wondering if Your Honor has a particular issue that you would like me to focus on. None in particular for me. Okay. Please proceed. I'm sorry, Your Honor. Your Honor, with regard to the first issue raised by the defense, the color photos, I think we briefed that at length. I think the briefs speak for themselves. I would also ask Your Honor to look at the color photos that were admitted to the jury, that were used at trial, versus the black and white copies that the defense wanted to use. And again, we would simply submit on our briefs on this, on that issue. With regard to the Campbell statements, as the district court found, there are two bases for their admission. One, a co-conspirator statement, and two, it was admitted not for the truth, but simply to show the effect on the victim. Now, the Layton case, a case that we cited, this is a Ninth Circuit case, I believe, from 1978 or 79. And the facts of that case are very tragic. They deal with the Jonestown massacre. And what this court found in Layton is that, one, the conspiracy does not have to be a criminal conspiracy. What the court found is that the question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture. It does not have to be an illegal venture. And Judge Phillips held three hearings on this issue. There's one hearing on May 17th, one on May 25th, and one on May 26th. Judge Phillips did not rush into admitting these statements. And the court allowed testimony. And testimony came in that the defendant and the co-conspirator, Rondeau, and the victim, and Campbell, who made those statements, were part of a group of inmates. And they had rules. They had rules. One rule is you don't ask to be placed in protective custody. Rule number two, one of those rules, is you don't write kites. Because what happened here, the victim had written two kites in early April of 2005. One kite, because he thought he was going to be placed back in general population. He wrote a kite saying, don't put me back in general population. I'm here for my own safety. I owe gambling debt. Don't put me back. He wrote a kite, gave it to another inmate to provide to the SHU lieutenant. And then he wrote another kite to another inmate who was suspected of having been asked. That's inmate Robinson. And inmate Robinson was suspected in the SHU of having asked to be placed in protective custody. So the victim wrote him another kite, said, hey, Chris and Skip, referring to Rondo. So he mentioned the defendant's name. He mentioned Rondo's name. Just want to know what's up with you. And one of the rules, as Officer Birmingham testified, one of the rules of this group of inmates, is you don't write kites mentioning names of other group members. There was this joint venture. And Officer Birmingham testified that inmate Campbell or Outlaw carried weight within that group of inmates. So there was a joint venture. But even then, it was relevant to undermine the self-defense. This was not a statement that the government introduced that happened a month later. This was a statement that took place minutes later as the victim was being transported to the infirmary. And even then, Judge Phillips gave a limiting instruction, gave it twice, telling the jury it's being admitted for the limited purpose. And we would submit, Your Honors, even if this Court were to hold that it was error for the abuse of discretion for that statement to come in. We would submit that. The evidence in this case was overwhelming. There was a lot of evidence. The surveillance video itself showed that there was a conspiracy, that the defendant and Rondo acted in concert. The testimony of the other witnesses, of the BOP officers who testified, three of them, about statements that they heard the defendant say, statements that show that this was a preplanned attack that had to do with a kite or something, a writing. And the fact that, as the BOP officers testified, the defendant never claimed self-defense after the assault. He never said, I was trying to frisk her locker. In fact, when they showed up, he shoved them. He told Officer Birmingham, open that slider door before you get another body on your hand, referring to a murder that had taken place on April 15th, the first murder at USP Victorville. He told him, open that, and then he threw the victim in. He never said, this victim threatened me. And the color photos that the government submitted, you can see the demeanor of the defendant. Photos taken shortly after the assault. You can see the victim scared, petrified, cut up. The defendant, on the other hand, not so. Not someone who was acting in self-defense. The jury had all of that. They had the video. With regard to the dismissal of Juror Foster, Judge Phillips, and this is at 161 of the executive record, one of the preliminary instructions instructed the jurors, a couple of things she told them. One, don't talk about this case to anyone. And two, don't talk with anyone who's connected to this case. She told them that. What does Juror Foster do? He sees a female. He's attracted to her. She's dressed up like 60s, 70s, like a hippie, as he told Judge Phillips. He likes her. Goes out, he smokes, she smokes. Courtyard in a Riverside courthouse, at break, first day he smokes a cigarette with her. What does he think? He's seen her. She's in the courtroom every day during the trial. He suspects she's married to one of the attorneys in the case. He knows, so he's thinking already she's connected to the case. Does he stay away from her? No. Day two, goes back, smokes a cigarette with her. Still thinking she might be married to one of the attorneys. And that's when he tells her. And she tells him she's the defendant's girlfriend. This is someone, a juror, who violated Judge Phillips' instructions. He can't follow directions. And the defense has not shown any prejudice, as required by this Court's precedent. There's no prejudice here. Your Honor, unless the Court has any further questions, we would simply submit on our briefs. All right. Thank you very much. You have just over a couple minutes for rebuttal. Just briefly to return to the obstruction. As the Court can tell from the sentencing hearing, the second ground, in a way, is trial testimony, which the judge found to be false. It was somewhat of an afterthought. This was the secondary reasoning of the Court. At first, the Court said, I'm concerned about the constitutional issues, about deterring somebody from presenting a defense, so I'm not going to reach this issue. As far as the testimony of Mr. Inouye, the trial testimony, the district court clearly erred in finding that Mr. Inouye testified that he was acting to protect Horlocker. That's at page 258 of the defendant's excerpts. There was no such testimony. You can read it a hundred times. There was no such testimony by Mr. Inouye to that effect. Where the district court got it wrong on that point was that Mr. Inouye testified that when the guards first came, he signaled to them and said, man down, get this guy out of here. The whole thrust of the testimony was Mr. Inouye was acting to protect himself. He never stated that I'm here to protect Mr. Inouye. No, the reason he frisked him and wanted to get the guy out of the wreck cage as quickly as possible was because he may have a weapon. So on that point, which seems central to the district court's ruling on obstruction, that Inouye had testified that he was acting to protect Horlocker, there was no such testimony. So that was clear error on the four corners of the transcript. Inouye testified basically, the thrust of his testimony was that the events of the day of April 29 had something to do with the lead up on the evening of April 28, when there was this conflict between Inouye and Horlocker, among others on the tier. In Inouye's trial testimony, in all material respects, was corroborated by the testimony of Odom, who he called, who talked about the events of the evening before and the threat by Mr. Horlocker. It was corroborated by Horlocker's own testimony in part, where Horlocker testified that there had been a back and forth and conflict between Horlocker and this other guy, Little Hog, down the hallway, which was basically the lead in to the testimony of Inouye. And it was also corroborated by this strip of plaster, a strip of cloth that Inouye had wrapped around his hand, the physical evidence to show that Inouye went into the wreckage that day, intending to do normal pull-ups as opposed to assault somebody. So the testimony was corroborated multiple ways. There is a concern here that without a fairly high standard, you're going to deter the right of Mr. Inouye to present a defense. And therefore, there was an incident on both grounds. There was clear error on both grounds on the factual findings. And this obstruction, this two points for obstruction of justice, simply should not have been imposed. So unless the Court has any other questions, I'll submit it at that point. All right. Thank you very much. Thank you. The case is now submitted. Thank you very much for your arguments. We will be adjourned. Thank you. Thank you. Thank you.
judges: Conlon, Pregerson, Murguia